SEALED                                                                          SEALED

AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | |
|---|---|
| United States of America<br>v.<br>Daniel Joseph Touizer,<br><br>*Defendant(s)* | Case No. 17-6341-Seltzer<br><br>FILED BY _____ D.C.<br>SEP 1 9 2017<br>STEVEN M. LARIMORE<br>CLERK U.S. DIST. CT.<br>S.D. OF FLA.-FT. LAUD. |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of  January 2005 to September 2017  in the county of  Broward and Miami-Dade  in the  Southern  District of  Florida , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C Sections 1341, 1343, and 1349 | Mail Fruad, Wire Fraud, and Conspiracy to Commit Mail and Wire Fraud |

This criminal complaint is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

_____
Complainant's signature

Cherice R. Abelard, FBI, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  09/19/2017

_____
Judge's signature

City and state:  Fort Lauderdale, Florida

Barry S. Seltzer, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIDT IN SUPPORT OF ARREST WARRANT

I, Cherice R. Abelard, being duly sworn, hereby declare and state as follows:

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since August 2012. I am currently assigned to the Miami Field Office of the FBI, which is located in this District. Prior to my employment with the FBI, I was an attorney for nine years. During my service with the FBI, I have been responsible for the investigation of a wide variety of federal crimes including mail fraud, wire fraud, and investment fraud.

2. I am one of the FBI case agents directing the investigation into Daniel Joseph Touizer ("Touizer") who is the Chief Executive Officer (CEO) of Wheat Capital Management, LLC (WCM) and numerous other businesses including Cinergy Health, Inc. (Cinergy); Omni Guard, LLC (Omni Guard); Infinity Direct Insurance, LLC (Covida); Infinity Diamonds, LLC later known as Investment Diamonds, LLC (ID); and Protectim Insurances Services, LLC ("Protectim") (hereinafter collectively referred to as the "Investment Companies") for violations of Title 18 United States Code Sections 1341 (mail fraud), 1343 (wire fraud), and conspiracy to commit both mail and wire fraud (1349). I have participated fully in the investigation and, as a result of my participation, I am familiar with the circumstances of the investigation and the information set forth in this affidavit.

3. Because this affidavit is being submitted for the limited purpose of establishing probable cause for the issuance of an arrest warrant, I have not included each and every fact known to me regarding this investigation.

### Investment Fraud Schemes, Generally

4. Investment fraud schemes involve the illegal sale or purported sale of financial instruments. Typical investment fraud schemes involve offers of guaranteed returns, low or no

risk investments, overly consistent returns, complex strategies, or unregistered securities. These schemes often involve exorbitant, undisclosed commissions and fees and/or direct stealing and embezzling of investor funds.

5.  Investment fraud schemes also frequently involve "capital calls." A capital call occurs when those running an investment company invoke a claimed legal right to require investors to pledge a certain amount of money to the company in addition to the investors' underlying investment.

## Overview of Touizer's Investment Fraud

6.  The FBI and a federal grand jury are currently investigating Daniel Joseph Touizer in connection with various investment fraud schemes in which Touizer and others working under his direction solicited individuals from around the United States to invest in Touizer's Investment Companies. Touizer and his co-conspirators made false and fraudulent claims to solicit investors throughout the United States to buy shares of stock and/or debt equity in his Investment Companies. *His conversations with investors contained in this Affidavit occurred in person and over the telephone and email.*

7.  In soliciting potential investors, Touizer personally employed sales pitches that included several materially false statements, including, but not limited to, that his Investment Companies' unique business models ensured a guaranteed return on investment; that his Investment Companies were successful and/or profitable; that his Investment Companies had received regulatory approval; that his Investment Companies did not issue capital calls; that Touizer did not personally take a salary or draw on funds invested in certain Investment companies; and that investor funds would be used for sales and marketing, working capital and general corporate purposes. In reality, the large majority of investor funds raised by Touizer were misappropriated by him for his and his co-conspirators' personal use, and to further their fraud

scheme. **Pursuant to the FBI's forensic analysis of subpoenaed bank records, approximately 72% of the $13,249,421.01 raised from investors, from July 2013 to February 2017, were personally misappropriated by Touizer and his co-conspirators.** Touizer asked his investors to mail and wire him their money, and investors used the U.S. mail to send payment to him.

<u>Touizer Investment Companies</u>

8. Touizer was the Founder and Chairman of WCM. WCM was incorporated in the State of Florida on or about March 18, 2015. According to WCM's website, the company maintained office space at One Financial Plaza located at 100 SE 3rd Avenue, Suite 601, in Fort Lauderdale, Florida.

9. Touizer was the CEO of Cinergy Health, Inc. ("Cinergy"). Cinergy was incorporated in the state of Florida on or about January 24, 2005 and dissolved on September 23, 2016. Touizer was the CEO of Infinity Diamonds, LLC. Infinity Diamonds was incorporated in the state of Florida on or about July 1, 2011. On or about January 13, 2013, Infinity Diamonds filed an Article of Amendment with the state of Florida for a name change to Investment Diamonds, LLC. Investment Diamonds was dissolved on January 2, 2014. Touizer was the CEO of Infinity Direct Insurance, LLC d/b/a Covida Holdings, LLC. Covida was incorporated in the state of Florida on or about February 20, 2013, and dissolved on September 23, 2016.

<u>Cinergy</u>

10. Cinergy was purportedly an insurance agency, which marketed and sold health insurance products through its internal telemarketing employees. According to investors interviewed by the FBI, Touizer represented himself as the founder and CEO of Cinergy.

11. From approximately January 2005 to January 2010, Touizer told potential investors that Cinergy's call-center business model ensured low overhead and large profits. Touizer further promised that Cinergy had licenses to sell insurance products in all 50 states. Touizer's claims

were false. Documents provided by Cinergy's insurance provider showed that from 2010 through 2011, approximately 75% of Cinergy's revenues went toward the company's payroll.

12. In or around September 2013, Touizer informed investors that Cinergy had failed due to claimed "licensing issues." A review of Cinergy's bank records reveal that Touizer commingled and used a large majority of the company's assets with funds maintained in his personal bank accounts, as well as the funds of other fraudulent businesses operated by him, including Omni Guard, ID, and Covida.

## Investment Diamonds

13. Investment Diamonds was purportedly a specialized marketer and distributor of rare and valuable "colored" gems. It operated from approximately July 2011 to January 2014. This company issued a Confidential Executive Summary to prospective investors on or about October 2011. According to the Confidential Executive Summary:

"The net proceeds which may be received hereby are planned to be utilized by the company as such funds may be received for sales, marketing, working capital and general corporate purposes. Managing member (Touizer) can pay himself up to $50,000 from the proceeds of this offering for services rendered."

14. Touizer claimed that investors could expect a 100% return on their investment in Investment Diamonds and its predecessor entity, Infinity Diamonds, LLC. During telephonic conversations with one investor, CD, Touizer claimed that he expected Investment Diamonds to make over $36 million in sales annually. In soliciting this investor, Touizer asked the investor to make an initial "minimum" investment of $100,000. When the investor stated to Touizer that the investor lacked sufficient liquid assets to make such an investment, Touizer encouraged the investor to withdraw funds from their individual retirement account ("IRA") in order to invest in

4

Investment Diamonds. Touizer also further enticed CD, by "sweetening the deal" and "gifting" this investor his personal stake in the investment of .25 units for "free."

15. Soon after CD's initial investment in Investment Diamonds, Touizer asked CD for an additional investment in the company. At that time, CD was concerned about the future of Investment Diamonds, so he asked for further assurances from Touizer as to how the company was performing and specifically how CD's additional investment funds would be used. Touizer said the company was performing well. In reality, the actual balance in the Investment Diamond's bank account showed $52,000. In fact, according to FBI forensic analysis of the bank records, without the infusion of CD's investment funds, Touizer's Investment Diamond bank account would have had a negative balance of approximately $104,000. Touizer further asserted in an email dated March 8, 2013, that, "CD's funds would be used to develop the Advisor Network." CD relied on Touizer's false representations and invested an additional $200,000 in Investment Diamonds, via a promissory note in March 2013.

16. A few months later, Touizer failed to pay CD the interest payment due on the promissory note. Touizer then told CD that the company had failed. However, Touizer promised that he would recover the investor's investment back within a few months. In reality, the company mainly failed because 80% of investor funds went to Touizer for his personal expenses and not to the Investment Diamond business  Also, there is no evidence that the Advisor Network ever existed. Touizer never returned any part of the investor's investment.

Infinity d/b/a Covida

17. In or around February 2013, Touizer formed Infinity d/b/a Covida, a purported insurance agency. According to investors interviewed by the FBI, Touizer solicited investors by claiming that Infinity would be profitable because it utilized Cinergy's pre-existing infrastructure.

18. According to Infinity Direct Insurance LLC's Confidential Private Placement Offering Dated June 3, 2013:

"The net proceeds [of the Offering] are planned to be utilized by the company for sales and marketing, working capital and general corporate purposes. It is not anticipated that the company will utilize any of the offering proceeds for loans to Member and/or the managing member or any affiliate thereof."

19. According to investor MH, in August of 2013, Touizer represented that Covida would be a $50-100 million dollar company and an investment of $200,000 in Covida would earn MH $500,000 to $1 million per year. MH had previously had a bad experience with a private placement offering and prior to investing in Covida, MH asked for assurances from Touizer that an investment in Covida would not be a similar mistake. As a result, on August 21, 2013, MH sent an email to Touizer stating, "MH's greatest fear is that MH had previously been taken before with Private Placement Memorandum (PPM) with investor money not going for the business and of course MH lost everything." Touizer reassured MH that this would not be the case with Covida. According to Touizer, the overhead and business operations for Covida were very low. On numerous occasions, MH asked Touizer about his intentions regarding the use of investor proceeds for Touizer as a salary. On each and every occasion that MH asked Touizer, he assured MH that he had not taken a salary in years from his Investment Companies and never intended on doing so with Covida. According to Touizer, all investor funds would be used solely for the business.

20. According to the FBI's forensic analysis of the bank records, less than 40% of investor funds were used for the company, and Touizer used the remaining funds for his and his co-conspirators' personal enrichment.

21. After MH's initial investment with Covida, MH constantly called Touizer for updates on the company. Touizer always had a glowing review of how the company was

performing and how returns would be fantastic for investors. In fact, according to Touizer, Covida would provide a constant retirement income stream for MH. MH was shocked when she received a capital call letter from Covida in July 2014. Pursuant to the terms of the letter, if MH did not re-invest in Covida, MH would lose MH's underlying investment. MH was concerned. MH again contacted Touizer and directly asked him what the capital call funds would be used for. Touizer told MH the funds would be used for the business and that her investment was safe and secure. As a result of the further representations made by Touizer, MH complied with the capital call request and sent $50,000 to Touizer on August 8, 2014.

22. According to the FBI's forensic analysis of Touizer's bank account records, over 50% of the capital call investment made by MH went to pay for Touizer's personal expenses, including Touizer's personal IRS tax lien. It was not until December 2014 that Touizer told MH that Covida had failed. MH was in shock and again questioned Touizer about his operations for Covida. Touizer told MH that he lost his own investment in Covida and, "to make matters worse he had not even received one single dime from the company." As mentioned above, the FBI's forensic analysis shows this was a blatant lie.

### Consent Search at Wheat Capital's Offices

23. On January 11, 2017, FBI agents conducted an interview with the commercial leasing agent responsible for leasing Wheat Capital's office space located at 4901 Northwest 17th Way, Suite 308, in Fort Lauderdale, Florida. According to the leasing agent, Wheat Capital, through Touizer, had entered into a lease for the office space beginning in or around February 2015. The lease agent advised that Touizer and Wheat Capital had vacated the premises in October 2016 after failing to pay rent due on the lease. Leasing agent signed written consent to search. [handwritten: OK]

24. In searching the former Wheat Capital office, FBI agents found the following:

7

a. Wheat Capital promotional marketing materials and brochures, including documents titled Wheat Capital "Confidential Business Plan";

b. Telephone scripts and training materials describing fundamental components of sales strategy, maps of the U.S. time zones, disposition sheets, and sales pitch sheets directing employees to follow up on leads and close investors;

c. Phone and extension lists for employees of Infinity d/b/a Covida; and

d Phone and extension lists for employees of Cinergy.

25. Agents also discovered a document titled **"Phone-pro's Creed,"** which was visibly displayed at various work stations. The "Creed" read:

> This is my phone. There are many like it, but this one is mine.
> My phone is my best friend. It is my life, I must master it as I must master my life.
>
> My phone, without me, is useless. Without my phone, I am useless. I must dial my phone true. I must think faster than the check writer who is trying to divert me. I must close him before he closes me. I will...
>
> My phone and I know that what counts in when raising capital is not the fronts we put out, the calls that we made, nor the stories we tell. We know that it is the checks that we collect that count. We will close...
>
> My phone is human, even as I, because it is my life. Thus, I will learn it as a brother. I will learn its weakness, its strength, its parts, its accessories, its sights and its capabilities. I will keep my phone clean and ready, even as I am clean and ready. We will become part of each other. We will...
>
> Before God, I swear this creed. My phone and I are universal soldiers. We are the masters of our check writers. We are the saviors of my life.
>
> So be it, until there is no stone left unturned and the check clears.

<u>Protectim Insurances Services, LLC</u>

26. In or around February 2017, Touizer formed Protectim Insurances Services, LLC (Protectim). According to a current employee interviewed by the FBI, Touizer owns Protectim,

8

but used Howard Yagerman as registered agent with Florida Department of State, Division of Corporations (Sunbiz.org) for the new business. Yagerman was a salesman for Touizer at Cinergy. Protectim, a purported insurance agency, markets and sells short-term insurance products.

27. According to an FBI interview of a current employee of Touizer, who has been employed by Touizer and his Investment Companies for several years, Touizer and his sales agents are currently using the same sales tactics with investors and potential investors, selling Protectim investments.

28. On August 11, 2017, Affiant obtained three Search and Seizure Warrants to be executed on Wheat Capital office, a Public Storage facility owned and operated by Touizer and the Protectim office. On August 15, 2017, FBI agents executed the Search and Seizure Warrants and obtained 95 boxes of evidence and over 100 hard drives and other pieces of electronic storage devices [CPA]. Such evidence contained investor files, business Investment Companies' marketing and promotional materials, including subscription documents and private placement memorandums, checks, bank notices and other business documents.

29. According to investors JK and KM, Touizer represented that the initial investment capital raise for Protectim was specifically going to be used to fund the call center and for marketing and advertising related to the business. However, pursuant to the FBI's forensic analysis of bank records, approximately 90% of the $1,799,960 raised from investors, from June 2017 to August 2017, were personally misappropriated by Touizer and his co-conspirators.

30. In addition to the foregoing, the Protectim bank records show significant transactions that occurred <u>after</u> the FBI executed the three premises Search and Seizure Warrants mentioned above. On or about August 21, 2017, Touizer withdrew from the Protectim bank

account $60,000 via a personal check. That same day Touizer caused the withdrawal of $600,000 dollars form the account in the form of a cashier's check.

31. Based upon my training and experience in fraudulent schemes and the information learned during the course of the investigation, your affiant respectfully submits that there is probable cause to believe that Touizer committed mail fraud, in violation of Title 18, United States Code, Section 1341; wire fraud, in violation of Title 18, United States Code, Section 1343; and conspiracy to commit mail and wire fraud, in violation of Title 18, United States Code, Section 1349.

32. Affiant submits that public disclosure of the information contained in this affidavit and public disclosure of the existence of the arrest warrant for Touizer may compromise the investigation, may cause suspects to flee in order to avoid apprehension, may cause the destruction of physical evidence, and may cause the further dissipation of investor funds. Accordingly, affiant respectfully requests that the Court seal this affidavit and the accompanying warrants in order to avoid jeopardizing the ongoing investigation into Touizer and his accomplices.

The foregoing is true and correct to the best of the Applicant's knowledge.

FURTHER AFFIANT SAYETH NAUGHT

_____
Cherice R. Abelard
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on September 19, 2017
At Fort Lauderdale, Florida

_____
BARRY S. SELTZER
UNITED STATES MAGISTRATE JUDGE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

No. 17-6341 SELTZER

UNITED STATES OF AMERICA

vs.

DANIEL JOSEPH TOUIZER,

Defendant.
_____/

FILED BY _____ D.C.

SEP 1 9 2017

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. FT. LAUD.

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to October 14, 2003? _____ Yes __X__ No

2. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to September 1, 2007? _____ Yes __X__ No

Respectfully submitted,

BENJAMIN GREENBERG
ACTING UNITED STATES ATTORNEY

BY: _____
ROGER CRUZ
ASSISTANT UNITED STATES ATTORNEY
Florida Bar Number 157971
99 N. E. 4th Street
Miami, Florida 33132-2111
TEL (305) 961-9207
FAX (305) 530-7976