UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 17-6341-SELTZER

UNITED STATES OF AMERICA,

vs.

DANIEL JOSEPH TOUIZER,

      Defendant.
_____/

## DETENTION ORDER

Pursuant to 18 U.S.C. § 3142(f), on September 25, 2017, a hearing was held to determine whether the defendant, Daniel Joseph Touizer, should be detained prior to trial. Having considered the factors enumerated in 18 U.S.C. § 3142(g), this Court finds that no condition or combination of conditions of release will reasonably assure either the appearance of this defendant as required or the safety of the community. Therefore, it is hereby ORDERED that the defendant, Daniel Joseph Touizer, be detained prior to trial and until the conclusion thereof.

In accordance with the provisions of 18 U.S.C. § 3142(i), the Court hereby makes the following findings of fact and statement of reasons for the detention:

    1.    The defendant is charged with mail fraud, wire fraud, and conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. §§ 1341, 1343, and 1349. Therefore, the defendant is charged with neither a crime of violence or terrorism nor a crime that involves a minor victim, a controlled substance, firearms, explosives, or destructive devices. 18 U.S.C. § 3142(g)(1).

    2.    The Court received credible evidence that the defendant, Daniel Joseph

Touizer, committed the offenses with which he has been charged. The Government proffered the Affidavit in Support of Arrest Warrant ("Affidavit") (DE 1) as its case agent's testimony on direct examination. The content of that Affidavit was not impeached, contradicted, or rebutted, and the undersigned accepts the facts set forth in that Affidavit as true for purposes of this bond determination. In pertinent part, the Affidavit states:[1]

### Overview of Touizer's Investment Fraud

> The FBI and a federal grand jury are currently investigating Daniel Joseph Touizer in connection with various investment fraud schemes in which Touizer and others working under his direction solicited individuals from around the United States to invest in Touizer's Investment Companies. Touizer and his co-conspirators made false and fraudulent claims to solicit investors throughout the United States to buy shares of stock and/or debt equity in his Investment Companies. His conversations with investors contained in this Affidavit occurred in person and over the telephone and email.
>
> In soliciting potential investors, Touizer personally employed sales pitches that included several materially false statements, including, but not limited to, that his Investment Companies' unique business models ensured a guaranteed return on investment; that his Investment Companies were successful and/or profitable; that his Investment Companies had received regulatory approval; that his Investment Companies did not issue capital calls; that Touizer did not personally take a salary or draw on funds invested in certain Investment companies; and that investor funds would be used for sales and marketing, working capital and general corporate purposes. In reality, the large majority of investor funds raised by Touizer were misappropriated by him for his and his co-conspirators' personal use, and to further their fraud scheme. Pursuant to the FBI's forensic analysis of subpoenaed bank records, approximately 72% of the $13,249,421.01 raised from investors, from July 2013 to February 2017, were personally misappropriated by Touizer and his co-conspirators. Touizer asked his investors to mail and wire him their money, and

---

[1] The undersigned has corrected minor grammatical errors in the Affidavit.

investors used the U.S. mail to send payment to him.

## Touizer Investment Companies

Touizer was the Founder and Chairman of WCM [Wheat Capital Management, LLC]. WCM was incorporated in the State of Florida on or about March 18, 2015. According to WCM's website, the company maintained office space at One Financial Plaza located at 100 SE 3rd Avenue, Suite 601, in Fort Lauderdale, Florida.

Touizer was the CEO of Cinergy Health, Inc. ("Cinergy"). Cinergy was incorporated in the state of Florida on or about January 24, 2005 and dissolved on September 23, 2016. Touizer was the CEO of Infinity Diamonds, LLC. Infinity Diamonds was incorporated in the state of Florida on or about July 1, 2011. On or about January 13, 2013, Infinity Diamonds filed an Article of Amendment with the state of Florida for a name change to Investment Diamonds, LLC. Investment Diamonds was dissolved on January 2, 2014. Touizer was the CEO of Infinity Direct Insurance, LLC d/b/a Covida Holdings, LLC. Covida was incorporated in the state of Florida on or about February 20, 2013, and dissolved on September 23, 2016.

## Cinergy

Cinergy was purportedly an insurance agency, which marketed and sold health insurance products through its internal telemarketing employees. According to investors interviewed by the FBI, Touizer represented himself as the founder and CEO of Cinergy.

From approximately January 2005 to January 2010, Touizer told potential investors that Cinergy's call-center business model ensured low overhead and large profits. Touizer further promised that Cinergy had licenses to sell insurance products in all 50 states. Touizer's claims were false. Documents provided by Cinergy's insurance provider showed that from 2010 through 2011, approximately 75% of Cinergy's revenues went toward the company's payroll.

In or around September 2013, Touizer informed investors that Cinergy had failed due to claimed "licensing issues." A review of Cinergy's bank records reveal that Touizer commingled and

used a large majority of the company's assets with funds maintained in his personal bank accounts, as well as the funds of other fraudulent businesses operated by him, including Omni Guard, ID, and Covida.

## Investment Diamonds

Investment Diamonds was purportedly a specialized marketer and distributor of rare and valuable "colored" gems. It operated from approximately July 2011 to January 2014. This company issued a Confidential Executive Summary to prospective investors on or about October 2011. According to the Confidential Executive Summary:

"The net proceeds which may be received hereby are planned to be utilized by the company as such funds may be received for sales, marketing, working capital and general corporate purposes. Managing member (Touizer) can pay himself up to $50,000 from the proceeds of this offering for services rendered."

Touizer claimed that investors could expect a 100% return on their investment in Investment Diamonds and its predecessor entity, Infinity Diamonds, LLC. During telephonic conversations with one investor, CD, Touizer claimed that he expected Investment Diamonds to make over $36 million in sales annually. In soliciting this investor, Touizer asked the investor to make an initial "minimum" investment of $100,000. When the investor stated to Touizer that the investor lacked sufficient liquid assets to make such an investment, Touizer encouraged the investor to withdraw funds from their individual retirement account ("IRA") in order to invest in Investment Diamonds. Touizer also further enticed CD, by "sweetening the deal" and "gifting" this investor his personal stake in the investment of .25 units for "free."

Soon after CD's initial investment in Investment Diamonds, Touizer asked CD for an additional investment in the company. At that time, CD was concerned about the future of Investment Diamonds, so he asked for further assurances from Touizer as to how the company was performing and specifically how CD's additional investment funds would be used. Touizer said the company was performing well. In reality, the actual balance in the Investment Diamond's bank account showed $52,000. In fact, according to FBI forensic analysis of the bank records,

without the infusion of CD's investment funds, Touizer's Investment Diamond bank account would have had a negative balance of approximately $104,000. Touizer further asserted in an email dated March 8, 2013, that, "CD's funds would be used to develop the Advisor Network." CD relied on Touizer's false representations and invested an additional $200,000 in Investment Diamonds, via a promissory note in March 2013.

A few months later, Touizer failed to pay CD the interest payment due on the promissory note. Touizer then told CD that the company had failed. However, Touizer promised that he would recover the investor's investment back within a few months. In reality, the company mainly failed because 80% of investor funds went to Touizer for his personal expenses and not to the Investment Diamond business. Also, there is no evidence that the Advisor Network ever existed. Touizer never returned any part of the investor's investment.

### Infinity d/b/a Covida

In or around February 2013, Touizer formed Infinity d/b/a Covida, a purported insurance agency. According to investors interviewed by the FBI, Touizer solicited investors by claiming that Infinity would be profitable because it utilized Cinergy's pre-existing infrastructure.

According to Infinity Direct Insurance LLC's Confidential Private Placement Offering Dated June 3, 2013:

"The net proceeds [of the Offering] are planned to be utilized by the company for sales and marketing, working capital and general corporate purposes. It is not anticipated that the company will utilize any of the offering proceeds for loans to Member and/or the managing member or any affiliate thereof."

According to investor MH, in August of 2013, Touizer represented that Covida would be a $50-100 million dollar company and an investment of $200,000 in Covida would earn MH $500,000 to $1 million per year. MH had previously had a bad experience with a private placement offering and prior to investing in Covida, MH asked for assurances from Touizer that an investment in Covida would not be a similar mistake. As a result, on August 21, 2013, MH sent an email to Touizer stating, "MH's greatest fear is that MH had previously been taken before with Private Placement Memorandum (PPM) with

5

investor money not going for the business and of course MH lost everything." Touizer reassured MH that this would not be the case with Covida. According to Touizer, the overhead and business operations for Covida were very low. On numerous occasions, MH asked Touizer about his intentions regarding the use of investor proceeds for Touizer as a salary. On each and every occasion that MH asked Touizer, he assured MH that he had not taken a salary in years from his Investment Companies and never intended on doing so with Covida. According to Touizer, all investor funds would be used solely for the business.

According to the FBI's forensic analysis of the bank records, less than 40% of investor funds were used for the company, and Touizer used the remaining funds for his and his co-conspirators' personal enrichment.

After MH's initial investment with Covida, MH constantly called Touizer for updates on the company. Touizer always had a glowing review of how the company was performing and how returns would be fantastic for investors. In fact, according to Touizer, Covida would provide a constant retirement income stream for MH. MH was shocked when she received a capital call letter from Covida in July 2014. Pursuant to the terms of the letter, if MH did not re-invest in Covida, MH would lose MH's underlying investment. MH was concerned. MH again contacted Touizer and directly asked him what the capital call funds would be used for. Touizer told MH the funds would be used for the business and that her investment was safe and secure. As a result of the further representations made by Touizer, MH complied with the capital call request and sent $50,000 to Touizer on August 8, 2014.

According to the FBI's forensic analysis of Touizer's bank account records, over 50% of the capital call investment made by MH went to pay for Touizer's personal expenses, including Touizer's personal IRS tax lien. It was not until December 2014 that Touizer told MH that Covida had failed. MH was in shock and again questioned Touizer about his operations for Covida. Touizer told MH that he lost his own investment in Covida and, "to make matters worse he had not even received one single dime from the company." As mentioned above, the FBI's forensic analysis shows this was a blatant lie.

## Consent Search at Wheat Capital's Offices

On January 11, 2017, FBI agents conducted an interview with the commercial leasing agent responsible for leasing Wheat Capital's office space located at 4901 Northwest 17th Way, Suite 308, in Fort Lauderdale, Florida. According to the leasing agent, Wheat Capital, through Touizer, had entered into a lease for the office space beginning in or around February 2015. The lease agent advised that Touizer and Wheat Capital had vacated the premises in October 2016 after failing to pay rent due on the lease. [The] [l]easing agent signed [a] written consent to search.

In searching the former Wheat Capital office, FBI agents found the following:
a.   Wheat Capital promotional marketing materials and brochures, including documents titled Wheat Capital "Confidential Business Plan";
b.   Telephone scripts and training materials describing fundamental components of sales strategy, maps of the U.S. time zones, disposition sheets, and sales pitch sheets directing employees to follow up on leads and close investors;
c.   Phone and extension lists for employees of Infinity d/b/a Covida; and
d.   Phone and extension lists for employees of Cinergy.

Agents also discovered a document titled **"Phone-pro's Creed,"** which was visibly displayed at various work stations. The "Creed" read:
This is my phone. There are many like it, but this one is mine. My phone is my best friend. It is my life, I must master it as I must master my life.
My phone, without me, is useless. Without my phone, I am useless. I must dial my phone true. I must think faster than the check writer who is trying to divert me. I must close him before he closes me. I will ...
My phone and I know that what counts in when raising capital is not the fronts we put out, the calls that we made, nor the stories we tell. We know that it is the checks that we collect that count. We will close...
My phone is human, even as I, because it is my life. Thus, I will learn it as a brother. I will learn its weakness, its strength, its parts, its accessories, its sights and its capabilities. I will keep my phone clean and ready, even as I am clean and ready. We will become part of each other. We will ...

7

Before God, I swear this creed. My phone and I are universal soldiers. We are the masters of our check writers. We are the saviors of my life.
So be it, until there is no stone left unturned and the check clears.

## Protectim Insurances Services, LLC

In or around February 2017, Touizer formed Protectim Insurances Services, LLC (Protectim). According to a current employee interviewed by the FBI, Touizer owns Protectim, but used Howard Yagerman as registered agent with Florida Department of State, Division of Corporations (Sunbiz.org) for the new business. Yagerman was a salesman for Touizer at Cinergy. Protectim, a purported insurance agency, markets and sells short-term insurance products.

According to an FBI interview of a current employee of Touizer, who has been employed by Touizer and his Investment Companies for several years, Touizer and his sales agents are currently using the same sales tactics with investors and potential investors, selling Protectim investments.

On August 11, 2017, Affiant obtained three Search and Seizure Warrants to be executed on Wheat Capital office, a Public Storage facility owned and operated by Touizer and the Protectim office. On August 15, 2017, FBI agents executed the Search and Seizure Warrants and obtained 95 boxes of evidence and over 100 hard drives and other pieces of electronic storage devices. Such evidence contained investor files, business Investment Companies' marketing and promotional materials, including subscription documents and private placement memorandums, checks, bank notices and other business documents.

According to investors JK and KM, Touizer represented that the initial investment capital raise[d] for Protectim was specifically going to be used to fund the call center and for marketing and advertising related to the business. However, pursuant to the FBI's forensic analysis of bank records, approximately 90% of the $1,799,960 raised from investors, from June 2017 to August 2017, were personally misappropriated by Touizer and his co-conspirators.

8

> In addition to the foregoing, the Protectim bank records show significant transactions that occurred <u>after</u> the FBI executed the three premises Search and Seizure Warrants mentioned above. On or about August 21, 2017, Touizer withdrew from the Protectim bank account $60,000 via a personal check. That same day Touizer caused the withdrawal of $600,000 dollars from the account in the form of a cashier's check.[2]

Affidavit ¶¶ 6-30 (DE 1). The Government advised that Touizer revealed a consciousness of guilt by remarking to an associate that he might be going to prison for a couple of years.

According to the Government, the total number of victims exceeds 150 and the fraud loss is approximately $19,000,000. If convicted of the instant offenses, therefore, Touizer, as the leader/organizer, would face an advisory Guidelines sentence of 168 to 210 months' imprisonment. 18 U.S.C. § 3142(g)(2).

3.   The pertinent history and characteristics of the defendant are significant to this Court's assessment of his candidacy for bond. According to the Pretrial Services Report, the defendant is 44-years old. He was born in Canada and came to the United States 23 years ago. He is currently a dual citizen of Canada and the United States. In the past 10 years, he has traveled to Israel on six to eight occasions to visit family.

For the past 15 years, the defendant has been residing at a home he owns in Aventura. The defendant advised that he is divorced. He further advised that his mother and his brother live in Canada and his half-sister lives in Israel; his father is deceased.

The defendant told Pretrial Services that he owns two businesses: Wheat Capital

---

[2] The defense proffered that Touizer withdrew these funds to prevent an employee with whom he had a disagreement from withdrawing the funds for his own benefit. According to defense counsel, he has provided the Government with documentation showing that these funds have since been deposited into a new account outside the reach of that employee.

and Protectim Insurance. He advised that Wheat Capital has been operating for three years, has five employees, and is valued at $15 million; he reportedly earns $25,000 per month from this business. Wheat Capital has five to seven business accounts, but he was unsure of the balances. The defendant advised that Protectim Insurance has been operating for six months and has no value at his time; he reportedly is not earning any income from this business. However, Protectim has two business accounts with a combined balance of $750,000. As for his personal assets, the defendant claims to own two paintings valued at $55,000 (combined), bank accounts with (combined) balances of $41,000, real property valued at $1.8 million (with a $900,000 mortgage), and a vehicle valued at $25,000. In addition, he owes the IRS $500,000 and is currently making monthly payments.

Notwithstanding that Touizer has residential and business ties to South Florida, several factors militate very strongly against his pretrial release:

- Of the $19,000,000 raised in investor funds, Touizer either withdrew (or had his co-conspirators withdraw) nearly $7,000,000 in <u>cash</u>, which money remains unaccounted for despite efforts by Government forensic accountants to trace the funds. In the absence of any explanation to the contrary, it is reasonable to believe that Touizer has access to at least a portion of these funds, which he could use to flee to avoid prosecution.
- Even though the Government forensic accountants were not able to trace Touizer's cash withdrawals, they were able to determine that Touizer has moved hundreds of thousands of dollars overseas, mainly to Israel and Canada, countries to which he has strong familial and emotional ties.

- Touizer has very close familial and emotional ties outside the United States. His mother and brother reside in Canada, a country of which he remains a citizen, and his sister and (pregnant) girlfriend reside in Israel. Further, records show that he has traveled two to three times per year to Canada and Israel.
- Following the execution of the FBI search, rather than cancel a previously booked flight to Israel, Touizer elected instead to re-book the flight to Israel with a new scheduled departure date of September 18, 2017.
- On the day of the search, one of Touizer's close associates made a spontaneous statement to the FBI in which he indicated that he would not be surprised if Touizer left the United States to avoid prosecution.
- The evidence of Touizer's guilt is very strong, as Touizer himself has tacitly acknowledged by telling an associate (after the FBI search) that he may "do a couple of years in prison."
- Touizer's actual prospective sentence – 168 to 210 months – is extensive and far greather than the "couple of years" he had apparently anticipated.

Accordingly, the Court concludes that the release of this defendant on bond prior to trial poses an unreasonable risk of flight. 18 U.S.C. § 3142(g)(3).

4. The Court further concludes that the defendant poses a significant economic danger to the community. Touizer was the leader/organizer of a $19 million scheme that utilized sophisticated means to defraud 150 individuals – the elderly, the wealthy, and others – over a 12-year period. Touizer even utilized a variation of his name to continue to engage in his fraudulent schemes.

According to the Government, Touizer's schemes continued to the time of his arrest.

11

Even after the FBI had executed the search warrants, and as recently as last week, Touizer was meeting with, soliciting, and obtaining additional funds from his victims, purportedly to be invested in Protectim. The Government has represented that Touizer and his associates misappropriated approximately 90% of investor funds from this fraud.

In sum, the defendant's actions cannot be characterized as isolated instances of misjudgment. To the contrary, his actions appear to be part of a deliberate, sophisticated, and more than decade-long scheme that continued to the time of his arrest, a scheme to defraud investors of millions of dollars and to divert a large portion of those funds to his own use. The defendant, therefore, poses an on-going and significant economic danger to the community. 18 U.S.C. § 3142(g)(4); see also United States v. Wardlaw, 2009 WL 10674241, at *2 n.1 (N.D. Ga. Jan. 27, 2009) (Danger to the community also encompasses pecuniary or economic harm, not just physical harm. See United States v. Reynolds, 956 F.2d 192, 192-93 (9th Cir. 1992) (citing United States v. Provenzano, 605 F.2d 85, 95 (3d Cir. 1979)). See also [United States v.] King, 849 F.2d [485] at 487 n.2 [11th Cir. 1988] (noting that the Senate Judiciary Committee intended for "the concern about safety [to] be given a broader construction than merely danger of harm involving physical violence.") (citation omitted)).

5. The Court specifically finds that there is no condition or combination of conditions of release that reasonably will assure the defendant's appearance as required or the safety of any other person and the community. 18 U.S.C. § 3142(e).

Based upon the above findings of fact, which were supported by clear and convincing evidence, the Court concludes that this defendant presents an unreasonable risk of flight if released on bond prior to trial and a danger to the community. Accordingly,

12

the Court hereby directs:

1. That the defendant be committed to the custody of the Attorney General for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal;

2. That the defendant be afforded reasonable opportunity for private consultation with counsel; and

3. That, on order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility in which the defendant is confined deliver the defendant to a United States Marshal for the purpose of an appearance in connection with a court proceeding.

DONE AND ORDERED at Fort Lauderdale, Florida this 25th day of September 2017.

BARRY S. SELTZER
United States Magistrate Judge

Copies to:

Jason Kreiss, Esq.
Chris Bruno, Esq.
Attorneys for Defendant Daniel Joseph Touizer

Roger Cruz, Esq.
Assistant United States Attorney

United States Marshal

United States Pretrial Services

13