UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO: 17-6341-mj-SELTZER

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

DANIEL TOUIZER,

        Defendant.

_____/

**PETITION FOR REVIEW OF MAGISTRATE'S DETENTION ORDER GRANTING GOVERNMENTS MOTION FOR PRETRIAL DETENTION AND INCORPORATED MEMORANDUM**
**AND**
**REQUEST TO RE-OPEN DETENTION HEARING**

COMES NOW, the Defendant, DANIEL TOUIZER, by and through his undersigned counsel and pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A), 18 U.S.C. § 3142 and 18 U.S.C. § 3145(b), and files these written objections and Petition for a de novo review of the Magistrate's Detention Order [DE 11] Granting the Governments Request for Pretrial Detention and Incorporated Memorandum of Law and Request to Re-Open Detention Hearing, and as grounds therefore states:

1.   The Defendant was arrested on September 20, 2017, and appeared for his Initial Appearance on the same day. At the Initial Appearance, the Government sought pretrial detention. The Court requested that the Government file a factual proffer in support of pretrial detention and set the Detention Hearing on September 25, 2017, at 10:00 AM.

2.   The Honorable United States Magistrate Judge Barry Seltzer presided over the Detention Hearing on September 25, 2017 [DE 11].

1

3. Attached and incorporated into this Petition for Review is a copy of the Detention Hearing transcript [DE 17].

4. The Government did not establish by a preponderance of the evidence that the Defendant is a "flight risk" or that he is an "economic danger" to the community.

5. Specifically, the Defendant objects to the conclusions made by Magistrate Seltzer in finding that the Criminal Affidavit was not impeached, contradicted or rebutted. Counsel for Mr. Touizer, Christopher Bruno, by way of his oral proffer and representations clearly rebutted the information that the Government had provided to the Court. Most of the Government's proffer was conclusory and incomplete.

6. The Defendant objects to the findings made by Magistrate Seltzer surrounding the offense wherein he determined that the number of victims exceeds 150; that Daniel Touizer is a leader/organizer of a fraudulent scheme; and that there is a fraud loss of $19,000,000.00 which is completely unsubstantiated. The Defendant further objects to the findings made by the Court as to the contents of the Pretrial Services Report pertaining to his personal assets. Mr. Touizer had inadequate time and was without the aid of his records in the holding block to fully detail all requested assets.

7. Finally, the Defendant objects to the findings made by Magistrate Seltzer that the evidence of the Defendant's guilt is very strong, and that releasing him on bond prior to trial posses an unreasonable risk of flight. He further concluded in his Order that the Defendant is a significant economic danger to the community, and that there is no condition or combination of conditions of release that would reasonably assure the Defendant's appearance or the safety of the community.

8. The Defendant respectfully requests this Court to re-open the detention proceedings and schedule an Evidentiary Hearing so that supplemental materials and witnesses that are relevant to the disputed issues of fact and the law can be considered by this Court.

ARGUMENT

When requested, the district court must promptly undertake an evaluation of the propriety of a magistrate judge's pre-trial detention order. United States v. King, 849 F.2d 485 (11th Cir.1988) (citing United States v. Hurtado, 779 F.2d 1467 (11th Cir.1985)). A district court reviews *de novo* a magistrate judge's detention order. United States v. Megahed, 519 F.Supp.2d 1236, 1241-1242 (M.D. Fla. 2007) (citing Hurtado at 1481). It has been held that a review by the district court contemplates an "independent consideration of all facts properly before it," Megahed at 1241 (citing U.S. v. Gaviria, 828 F.2d 667, 670 (11th Cir.1987) (citing Hurtado at 1480-81)). If in fact it is necessary to the resolution of an essential issue of fact, the district court may marshal further evidence by convening a hearing. (Megahed at 1242). As such, the Defendant hereby requests that this Court set a detention hearing.

Too often, detention is thought of as the norm, not the exception, but under the law just the opposite is true. See United States v. Salerno, 481 U.S. 739 (1987) (In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception). This is not a presumption of detention case. The Bail Reform Act requires the Court to presume that release is appropriate. The policy underlying the Bail Reform Act "is to permit release under the least restrictive condition compatible with assuring the future appearance of the defendant." United States

3

v. Price, 773 F.2d 1526, 1527 (11th Cir.1985) (per curiam).

When the United States seeks to detain a criminal defendant pending trial based on his status as a flight risk, it must prove by a preponderance of the evidence that no condition or set of conditions will reasonably assure his presence at trial. United States v. Medina, 775 F.2d 1398, 1402 (11th Cir.1985) (citing United States v. Chimurenga, 760 F.2d 400, 405-06 (2d Cir.1985).

Pursuant to 18 U.S.C. § 3142(g), there are several factors the Court shall consider in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and secure the safety of the community. These factors include (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of *section 1591,* a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device; (2) the weight of the evidence against the person; (3) the history and characteristics of the person, including (a) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and (b) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

While the Government seems to believe that they have a strong case against Mr. Touizer based upon the allegations contained in the Criminal Complaint and Detention Memorandum, the

4

weight of the evidence, or lack thereof, is only one of the factors for the Court to consider at a detention hearing. United States v. Townsend, 897 F.2d 789 (9th Cir. 1990). This factor is the least important of the various factors outlined in 18 U.S.C. § 3142(g) for the Court to consider on the issue of release. See United States v. Motamedi, 767 F.2d 1403 (9th Cir. 1985). In regards to the strength of this case, the Defendant asks this Court to review the following assertions that were made by the Government to adequately assess whether he is truly a "flight risk" or an "economic danger to the community" warranting pretrial detention:

OVERSEAS BANK TRANSFERS

While the Government informs the Magistrate Court that there are wire transfers to Israel, [DE 17:14, 21], there was no evidence presented as to the amount of money purportedly transferred overseas. Mr. Touizer has a mentally ill sister who resides in Israel and is unable to support herself. He additionally has a relationship with a female whom he believes is presently pregnant with their child. The funds forwarded to Israel, which the Government alleges are in excess of several hundred thousand dollars, actually reflect years of payments to his sister, girlfriend and father who recently died earlier in 2017. The Government offered no documentary evidence or other verification to support that the transfers were for any other purpose. The Government did not establish at the hearing that the transfers came from "Investor Funds". The Defendant would contend that the assertion of sending money to Israel, for at least the last seven years, for family purposes should not have been considered as an aggravating factor for detention hearing purposes. The Government's assertion of transfers to Canada were neither quantified nor established through competent evidence. Evidence of danger should involve quantifiable, objective evidence. See United States v. Motamedi,

767 F.2d 1403, 1407 (9th Cir. 1985). There was simply no other evidence provided by the Government as to these transfers. Daniel Touizer's mother, who is elderly and retired relies on the Defendant for financial sustenance. The Defendant's brother, Stephan Touizer, is a Canadian citizen and continues to have ties to the country. Bank transfers to family members are not unusual nor should they raise concerns. It was never established that any of the transfers were from the fruits of the alleged fraud. This Court has the full authority to conduct its own detention hearing in order to clarify matters of disputed facts and Mr. Touizer urges this Court to do so. The evidence does not support that the funds were deliberately transferred for their concealment nor placed outside of the country to aide in the Defendant's escape from prosecution. As the Government claims, there is no evidence to support that Mr. Touizer had any plan to escape this country beginning in 2010, when the transfers began to take place.

MAKING INTERNATIONAL TRAVEL PLANS AFTER SEARCH WARRANT ISSUED

In addressing the Magistrate, the Government felt that Mr. Touizer was a flight risk and only "somewhat of a danger" to the community on the economic side. [DE 17:12, 2]. The main reason that the Government asserted that Mr. Touizer was a flight risk was the mere fact that he had purchased a ticket to travel to Israel back in April, 2017 and had not cancelled his travel plans once a search warrant was executed upon his businesses on August 15, 2017. To put things in proper context, however, this trip to Israel should raise no concern of "flight risk" whatsoever, not to mention that the Government has not even established by clear and convincing evidence that Mr. Touizer poses even a slight risk of non appearance. See United States v. Patriarca, 948 F.2d 789 (1st Cir. 1991)(Clear and convincing evidence means proof that a particular defendant actually poses a

6

danger, not that defendant in theory poses a danger.) This plane ticket was originally purchased and was merely rebooked so that Daniel could make the trip that he was already intending on making before. The fact that his businesses were searched by the FBI, while it raised some concerns, did not stop him from conducting his business operations as he believed he was doing nothing unlawful. In fact, he also believed he was doing nothing unlawful when the SEC decided to conduct a complete investigation as to his dealings with Wheat Capital Management. He fully cooperated with them and provided full documentation and information whenever requested. In the end, the SEC found that there was no dissipation of investor funds. Additionally, Mr. Touizer, was aware that his tax records were being subpoenaed by the Government from his accounting firm even before the search warrant was executed. Mr. Touizer had every opportunity to leave the United States during all these investigations but never did. All of his travel itinerary included roundtrip tickets.

Daniel Touizer, who has resided in the United States since 1988 and became a citizen of this country in 2008, has traveled to Israel on many occasions in the past. Daniel had family, including his father, now deceased and a sister that currently resides there. He would travel to visit his family members on different occasions. The Government, who is in possession of Mr. Touizer's passport, clearly can see his international travel. All of his travels have been for legitimate purposes, always! The reason that Daniel traveled out of the Country the last 3 (three) times was when his father was seriously injured and passed away. At age 83, the Defendant's father became comatose after a serious head injury subsequent to an unfortunate fall down a staircase in Paris, France. In December, 2016, Daniel traveled to Paris to see his father. Shortly thereafter, his father died and Daniel again traveled to Israel for his father's funeral. A short time later, he went again to attend the memorial of his

7

father s death.  He traveled back immediately after the ceremony.

Putting it all into its proper context, there is nothing at all suspicious about any of his travels abroad.

## MR. TOUIZER CHANGED HIS NAME

The Government has informed the Magistrate Court that Mr. Touizer changed his name during the last two business ventures he developed and that this should cause concern that he is likely to flee the jurisdiction. [DE 17:15, 24]. The Defendant's true legal name is Joseph Daniel Touizer, however, growing up, he typically went by "Daniel" or "Dan". The change or variation in names that Mr. Touizer started to use is not so dramatically different that it should be of concern to the Court. In fact, if you Google, "Joseph Touizer" it also brings up things having to do with Daniel Touizer. The Government's position that it is common for individuals that intend to remove any past allegations of misconduct or criminal misconduct from being discovered may be true, but does not apply in this case. [DE 17:15, 15]

Mr. Touizer used a slight variation of his true legal name for two very legitimate reasons. One of those reasons included the fact that his grandfather's name was Joseph as well. As Mr. Bruno pointed out to Magistrate Seltzer, he wanted to honor his grandfather after his death. However, in conjunction with that reason was the fact that "Joseph" was the name in the Bible that used huge storage bins to store wheat in Egypt and it made all the sense in the world after the launch of Wheat Management Corporation, a commercial investment organization specializing in building storage facilities. To Daniel, it was a blessing and condoned by his Rabbi and Kabbalist whom he took advice from.

### ONE "VOICED OPINION" THAT DANIEL TOUIZER IS A FLIGHT RISK

Within the Governments detention memorandum [DE 7], it states that, "One of his associates recently told the FBI that he would not be surprised if Touizer left the United States to avoid prosecution, and that he would be a fugitive from justice." Interestingly, throughout the investigation according to the Government, the FBI interviewed not only investors, but business associates and current and former employees. But only one (1) of those persons has been identified in the Governments filed memorandum and to Magistrate Seltzer during the detention hearing as the only person who has "voiced the opinion" that Mr. Touizer does travel and it would not surprise this particular individual if he just left and didn't come back. Even the Magistrate Judge took issue with this bold assertion and stated:

> **THE COURT**: It's just an opinion. Was it based on anything in particular that Mr. Touizer had said or it was just this individual's opinion?

The Government had no specific facts that would assist the Court in deciding whether to detain Mr. Touizer. [DE 17: 17, 23].

### TYING THE MONEY RAISED BY MR. TOUIZER TO ALLEGED MISAPPRORIATED FUNDS

One question that Magistrate Seltzer asked during the detention hearing was whether the alleged misappropriated funds came from investor funds and what was the amount of these monies that were being claimed by the Government.

It appears that while the Government was careful to do their best [we] could to tie the money that was raised to the investors identified in the criminal complaint [DE 17:18, 6] they didn't actually have it entirely correct. The Government asserts that a little under approximately (7) seven million

9

dollars came from investor funds. Nothing was presented to the Court as to how they conducted their analysis of this very damaging claim against Mr. Touizer. No bank statements were identified or introduced by the Government showing where this seven million dollar amount came from. Based upon this presentation, Magistrate Seltzer has no idea if the funds came out of a corporate account, specifically Wheat Capitol Management One, Two, or Three or any of the other corporate entities identified in the criminal complaint. This is important and should be clarified since the SEC had already done a complete investigation concerning investor monies relating to Wheat Capital and has officially found no dissipation of assets in those investments. Although the investigation referenced Howard Marcowitz, he was the Chief Financial Officer for Touizer's companies and worked alongside him during the period of time relative to the investigation. This declination letter from the SEC was sent directly to Attorney Christopher Bruno. Likewise, Mr. Touizer cooperated fully with the investigation, turning over records and answering numerous requests for information over a ten month period. Mr. Touizer waived privileges that existed with regard to his accounting firm and gave up everything. With complete transparency to the highest government watchdog in the securities industry, nothing, even at a civil level, was discovered. Mr. Touizer was even willing to be questioned under oath. It is believed that the Government is mistaken in their assertions with regard to this amount of money, although this assertion has been relied upon by Magistrate Seltzer in detaining Mr. Touizer. A full de novo hearing before this Court should help clarify this damaging claim made by the Government. The Court is entitled to see actual records rather than relying on mere assertions and conclusory statements.

### $600,000.00 HAS BEEN MISSAPPROPRIATED AND UNACCOUNTED FROM PROTECTIM

The Government's Memorandum in support of pretrial detention alleges that FBI investigation shows that Daniel Touizer and his associates stole about 90% of investor funds from the Protection Bank Account. The proffer went on to further claim that Mr. Touizer recently obtained two cashier's checks, one for $600,000.00 and the other for $60,000.00 and the money has not been accounted for. [DE 17:7, 3]. While these statements, if true, would tend to possibly show misappropriation of funds, Mr. Bruno explained to Magistrate Seltzer the chronological chain of events that resulted in these above mentioned funds being lawfully withdrawn from the bank account of Protectim, located at Wells Fargo. There was absolutely nothing wrong with what Mr. Touizer did in order to secure investor funds from the immediate threat of a disgruntled employee, Howard Yagerman, who had signing authority on the account. Every nickel that was withdrawn was immediately deposited into another corporate account for Protectim. The new account name is under Protectim Holdings, LLC, which is wholly owned by Protectim Holdings, LLC., the company that all investors own stock in.  Additional new investor funds in the amount of $400,000.00 were also deposited into this new corporate account for Protectim. Mr. Bruno also had the bank records and copies of the cashier checks used to make the transfer to provide the Court. [DE 17: 28, 25–29]. Most importantly, the Government was made fully aware of the Protectim bank transfers prior to the arrest of the Defendant.

Based upon this information, this is yet another example of how the strength of the Government's case isn't exactly what it appears to be on its face. There has been absolutely no misappropriation of investor funds from Protectim. Mr. Touizer has raised an approximate 1.9 million of the 2.4 million set forth in the Private Placement Memorandum. (PPM) Any money that

was distributed directly to Daniel Touizer from Protectim, whether it was a professional fee or otherwise was absolutely disclosed and permitted under the terms of the PPM that all investors were provided and agreed to. Additionally, the PPM also provided that Protectim could loan money, which it did in the amount of $500,000.00 to Wheat Capital as the shareholders are identical in both entities. This $500,000.00 loan was completely paid back to Protectim.

Protectim Insurance had just launched sales and marketing on September 5, 2017 with (6) six salesman bringing the total staff to almost (12) twelve employees. Mr. Touizer has had great success in the medical insurance industry in the past and therefore his ability to make Protectim Insurance Services profitable was extremely high. Cinergy Health, which was formed by Daniel Touizer in 2005, was also a National Licensed Insurance Agency, employing almost 200 people and doing close to 150 million in annual sales. This was a real and profitable business operation that was formed and run by Daniel Touizer.

The allegation that Daniel Touizer and his associates had stolen about 90% of investor funds from Protectim Insurance Services is just inaccurate. Again, this statement is merely conclusory and insufficient for the Court to rely upon for pretrial detention. Conclusory proffer by Government may not be sufficient. See United States v. Robinson, 2011 WL 1791319 (D. Mass. 2011); See also United States v. Cooper, 2008 WL 2331051 (D.Md. 2008).

When you break down the numbers in black and white it will show the following:

| | |
|---|---|
| $600,000.00 | TD Bank (Protectim Holdings) |
| $400,000.00 | TD Bank (Protectim Insurance Services) |
| $125,000.00 | Trust Account (Attorney Rodriguez Trust Account) |
| $340,000.00 | Disclosed Consulting Fee to Daniel Touizer (See PPM) |
| $432,500.00 | Start up Expenses- Accounted for through proper invoicing. |
| $1,947,500.00 | Total Amount of Investor Funds Raised for Protectim |

Again, the allegation that 90% of investor funds into Protectim were stolen is just inaccurate and another reason why Daniel Touizer is not an economic danger to the community.

CONCLUSION

The true object of bond is to secure the presence of a Defendant at all court proceedings. United States v. Velez, 693 F.2d 1081 (11th Cir. 1982). Only in rare circumstances should pretrial release be denied. Sellers v. United States, 89 S.Ct. 36, 38 (1968). Doubts regarding the propriety of release should be resolved in favor of the Defendant. Herzog v. United States, 75 S.Ct. 349, 351 (1955). Therefore, the Defendant, DANIEL TOUIZER, respectfully requests this Honorable Court to reverse the decision of the Honorable United States Magistrate Judge Barry Seltzer ordering pretrial detention. The Defendant requests that the Court enter an order of release with conditions. The Defendant through his counsel submits that there are conditions of release that will reasonably assure his appearance as required and the safety of any other person and the community at large. These conditions would include a monetary bond, supervision by pretrial services, which could include electronic monitoring while on house arrest and any other conditions of release that this Court deems just and appropriate.

                Respectfully submitted,

                MICHAEL J. ENTIN, P.A.
                ONE EAST BROWARD BLVD.
                SUITE 925
                FORT LAUDERDALE, FLORIDA 33301
                TELEPHONE (954) 745-4900
                FACSIMILE (954) 745-4910

                _s/Michael J. Entin_____
                MICHAEL J. ENTIN, ESQ.
                FLORIDA BAR NUMBER: 270261
                MJENTIN@AOL.COM

JONATHAN S. FRIEDMAN, P.A
ONE EAST BROWARD BLVD.
SUITE 925
WELLS FARGO BANK TOWER
FORT LAUDERDALE, FLORIDA 33301
TELEPHONE: (954) 713-2820
FACSIMILE: (954) 713-2894

/S/ Jonathan S. Friedman_____
JONATHAN S. FRIEDMAN, ESQ.
FLORIDA BAR NUMBER: 973297

## CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that on October 10, 2017, the undersigned attorney electronically filed the foregoing document with the Clerk of the Court, AUSA, United States Attorney Office-Southern District of Florida, and other counsel of record, if any, using CM/ECF and has served same via U.S. Mail to those counsel(s) or individuals, if any, who are not authorized to receive electronically Notice of Electronic Filing.

/S/ Michael J. Entin_____
MICHAEL J. ENTIN, ESQ.

/S/ Jonathan S. Friedman_____
JONATHAN S. FRIEDMAN, ESQ.

14